Filed 6/23/15  P. v. Green CA2/4
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B246518 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA062567) |
| v. | |
| BRIAN GREEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed as modified.

Lynne S. Coffin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jonathan J. Kline and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

This case arises out of a racially-motivated attack on Thomas Johnson by defendant Brian Clay Green, Gunnar Stine and Jacob Gurfinkiel.[1] The jury convicted defendant of attempted murder (§§ 664/187, subd. (a)), assault with a deadly weapon or by force likely to cause great bodily injury (§ 245, subd. (a)(1)), and making criminal threats (§ 422).[2] In regard to the attempted murder conviction, the jury found true the allegations that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and that the offense was a hate crime committed in concert with others (§ 422.75, subd. (b)).[3] In regard to the assault conviction, the jury found true the allegations that defendant personally used a deadly weapon, a knife (§ 12022, subd. (b)(1)); that he personally inflicted great bodily injury (§ 12022.7, subd. (a)), and that the offense was a hate crime committed in concert with others (§ 422.75, subd. (b)). In regard to the criminal threats conviction, the jury found true the allegations that defendant personally used a deadly weapon, a knife (§ 12022, subd. (b)(1)) and that the offense was a hate crime committed in concert with others (§ 422.75, subd. (b)).

After the jury rendered its verdicts, a bench trial was conducted in which the trial court found that defendant had suffered two prior serious felony convictions within the meaning of the Three Strikes law (§§ 667, subd. (a)(1), 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and section 667, subdivision (a)(1). The trial court

---

[1]  Stine and Gurfinkiel were charged as codefendants but were not tried with defendant.

[2]  All statutory references are to the Penal Code.

[3]  The jury found "not true" the allegation that defendant personally used a dangerous weapon (a knife) during the commission of the attempted murder.

sentenced defendant to an aggregate term of 125 years plus three consecutive life terms.

In his appeal, defendant raised three claims of instructional error: (1) the trial court erred in failing to instruct on the principles of self-defense, defense of others and mutual combat; (2) the trial had a sua sponte duty to instruct on the lesser included offense of attempted voluntary manslaughter; and (3) the trial court erred in rejecting defense counsel's request for the unanimity instruction. Next, defendant urged that his sentence violated section 654. Lastly, defendant contended that trial counsel provided ineffective assistance because he failed to object to the admission of defendant's pretrial interview with two detectives, an interview that defendant claims, for the first time on appeal, was coerced.

In our opinion, filed on January 7, 2015, we found no prejudicial error and, other than correcting a minor error in the award of pre-sentence custody credit, affirmed the judgment.

Defendant filed a petition for review in the California Supreme Court. He raised only two contentions: (1) the trial court's rejection of his request for the unanimity instruction constituted prejudicial error; and (2) his sentence violated section 654.

The California Supreme Court granted review but not on the issues raised by defendant. Instead, it transferred the case to us "with directions to consider whether to remand to the trial court for resentencing in accordance with Penal Code section 667, subdivision (e)(2)(A) (see *People v. Smith* (2001) 24 Cal.4th 849, 852 [exception to the waiver rule for unauthorized sentence].)" (See Cal. Rules of Court, rules 8.500(b) & 8.528(d).)

We directed the parties to file letter briefs addressing our Supreme Court's order. (See Cal. Rules of Court, rule 8.200(b)(1).) Having received and reviewed those letters, we conclude that the trial court erred in two respects in calculating

3

defendant's sentence but that a remand is not necessary to correct those errors. Instead, we re-file our earlier opinion with the addition of a new section G ("Sentencing") and dispositional paragraph correcting the sentencing errors.

## STATEMENT OF FACTS

### A. Factual Overview

The crimes were committed around midnight on February 16, 2008. Johnson, the victim, is black. Johnson was accompanied by his roommate Daniel Boston, who is white, when he (Johnson) was attacked by defendant, Stine and Gurfinkiel. During the attack, Johnson was punched, kicked, stabbed and threatened as the men yelled multiple racist epithets. Defendant is a member of the SFV Peckerwoods, a white-supremacist gang in the San Fernando Valley. Stine and Gurfinkiel are members of the Chatsworth Skinheads, another white-supremacist gang. The two gangs share a hatred of African-Americans. It is common for the two gangs to commit crimes together.

On the day of the attack, Johnson was 26 years old, five feet six inches tall and weighed 145 pounds. Boston was between 19 and 21 years old, weighed 130 to 135 pounds and was five feet, eight or nine inches tall.[4] Defendant was 27 years old. He weighed 220 pounds and was five feet 11 inches tall. Stine was 17 years old, five feet eight inches tall, and weighed between 130 to 140 pounds. Gurfinkiel was almost 18 years old, five feet, seven inches tall, and weighed 140 pounds.

Defendant testified at trial and denied attacking Johnson. Defendant claimed that Stine assaulted Johnson and that he (defendant) entered the struggle to stop it.

---

[4] Boston did not testify at trial.

4

## B. The Prosecution's Case-in-Chief

### 1. *Johnson's Testimony*

At approximately midnight on the evening of February 16, 2008, Johnson and Boston were walking on Winnetka Avenue in the San Fernando Valley, heading towards their home. Johnson and Boston were on the opposite side of the street from defendant, Stine and Gurfinkiel. Johnson heard a man say, in an "aggressive, angry tone[,]" "There is a fucking nigger over there." Johnson ignored the statement and continued to walk with Boston as a man stated: "What are you doing over here, nigger[?]." To get home, Johnson and Boston needed to cross the street. To minimize the potential of any confrontation, they crossed to the north of the three men. Everyone was now on the same side of the street.

Johnson "heard footsteps coming towards [him], running towards [him] at a fast pace." Johnson turned around and Stine threw a "knock-out-punch" at him. Johnson ducked and Stine's punch "missed." Johnson testified: "I kind of went back and I hit him [Stine] and he fell to the ground. . . . I kind of just put my hand on his chest or, like, upper neck area and I kneeled on the ground, [and] was asking him if he knew me or what his problem was." (When Johnson first turned around, he saw defendant and Gurfinkiel standing next to a car.)

Johnson knelt with one knee on the ground and used one arm to try "to hold [Stine] in place." Suddenly, defendant came up and kicked Johnson "pretty hard" on the left side of his face. Defendant tried to kick Johnson again but Johnson used his "arm to sweep [defendant's] leg away." Johnson looked up at defendant and said: "Are you guys going to jump me now or whatever?" Defendant came around to Johnson's back, put his arm around him and pointed a knife within one or two inches of Johnson's eyes. Defendant said "Fuck you, nigger" and told Johnson that if he did not "get off his friend [Stine], he [was] going to cut [his] fucking throat." Johnson, believing his life was in danger, pushed defendant's

5

hand away, jumped up, and started boxing with defendant. Stine stood up and joined defendant in fighting Johnson. Johnson punched Stine in the face.

Gurfinkiel ran toward Johnson and joined in the attack. Johnson hit Gurfinkiel before Gurfinkiel could hit him. Gurfinkiel said: "Fucking nigger[] hit me in the face." Defendant, Stine, and Gurfinkiel formed a circle around Johnson, and "operat[ing] as a team," hit him. Defendant was behind Johnson most of the time as the three men punched him. Johnson tried to get out of the circle but defendant and Stine pushed him back.

At one point, Johnson saw that he was bleeding "everywhere." Johnson "kind of stopped" fighting and, accompanied by Boston, "rush[ed]" back to their home. As he left the scene, Johnson heard bottles breaking. One of his three assailants stated: "It's time for some white power on this motherfucker" and "Heil Hitler."

Johnson and Boston returned home and contacted the paramedics. Johnson was transported to the hospital. He had been stabbed twice, once in his lower back and once in his upper back. The latter stab punctured his right lung and would have been fatal if he had not quickly received medical treatment. Johnson underwent surgery and was hospitalized for several weeks. In addition, his vision "is worse in [his] left eye than it is in [the] right eye."

Boston did not help Johnson during the attack. During the assault, one of the three men called Boston "a fucking nigger lover."

2. *Testimony from Two Eyewitnesses*

Shortly before their attack on Johnson, defendant, Gurfinkiel and Stine had been at a party. They, along with three young women, left the party and drove to Gurfinkiel's home. It was at that location that defendant and his accomplices

6

attacked Johnson.  At trial, two of the women, Kirsten Marlow and Samantha Parker, testified for the People.

a. *Marlow's Testimony*

Marlow testified that the group arrived by car at Gurfinkiel's home.  Marlow saw Johnson and Boston walking in their direction on the opposite side of the street.  Everyone except Stine exited the car.  Defendant first said:  "If you yell nigger, [Stine will] come out of the car." and then he yelled "Nigger."  As Johnson and Boston crossed the street in his direction, Stine left the car and yelled:  "What the hell are you staring at, you dumb nigger?"  Stine ran towards Johnson and "[t]hat's when the fight started breaking out."  Johnson and Stine were "fighting on the ground," "[t]hey were all just in a fight" for a "few minutes."  Johnson did not have any weapon in his hand during the fight.  Defendant approached the fight and "kicked [Johnson] in the head."  At some point, Gurfinkiel joined the fight.  According to Marlow, Johnson hit Gurfinkiel "for self-defense."  Marlow did not see who stabbed Johnson.

Eventually, the three men, Marlow and Parker retreated to Gurfinkiel's home.  Defendant and Stine each had a bloody knife.  Defendant told the group:  "Look what I did.  I stabbed the nigger."

Initially, Marlow did not speak with the police about the events.  She "fear[ed]" for her "life" because defendant, Stine and Gurfinkiel were white supremacists.

b. *Parker's Testimony*

Parker testified that she, Marlow and another women had been at a party with defendant, Gurfinkiel and Stine.  The men had been drinking.  The six of them left by car to return to Gurfinkiel's home.  When they arrived, everyone left

the car except for Stine.  Defendant told the group that he knew how to get Stine out of the car.  Defendant then stated:  "There is a fucking nigger."  Marlow saw Johnson and Boston walking on the other side of the street.  Stine left the car and pursued Johnson.  As Stine approached Johnson, Stine made a Nazi salute and loudly said:  "Nigger" and "White Power."  At the same time, defendant shouted "White Power."

When Stine reached Johnson, Stine threw the first blow and "[t]hey started fighting."  Defendant joined the fight as Johnson and Stine "were wrestling on the ground."  Defendant kicked Johnson "pretty hard" in the face.  Soon, Gurfinkiel joined the fight, "yelling out racial stuff."  The three men "piled on [Johnson]," "all attacking [him] at the same time."  "Towards the very end of the fight," Gurfinkiel gave a Nazi salute.  The fight ended when Johnson, who was bleeding, "[got] up and [left]" with Boston.  As Johnson was "walking [away] real quick," Gurfinkiel walked towards him but defendant held him back.  Marlow did not see who stabbed Johnson.

The three men and the women went to Gurfinkiel's home.  Defendant showed Parker a bloody knife and said:  "I stabbed a fucking nigger."  Parker saw that Stine also had a knife.

### C.  The Defense Case

1. *Defendant's Testimony*

Defendant testified at trial on his own behalf as follows.

He and the others arrived by car at Gurfinkiel's home.  He (defendant) was intoxicated and Stine "was drunk."  Defendant pulled Stine out of the car.  Johnson and Boston walked near them on the other side of the street.  Gurfinkiel yelled:  "What the fuck are you doing?"  Johnson and Boston crossed the street immediately in front of their car.  From defendant's point of view, Johnson became

8

the aggressor at this point.  Defendant explained:  "If we say something to him and he doesn't want to engage or isn't involved in it, why didn't he just keep walking . . . instead of crossing the street to where we were at in front of us?"

Stine approached Johnson and Boston.  Stine started "talking smack to them[5]; and they [Johnson and Boston] started talking smack back, and [Johnson] threw a beer bottle and then they started fighting."  (The bottle did not hit anyone.)

Stine and Johnson punched each other and fell to the ground where they continued to fight.  Johnson "was straddling [Stine], punching [him] in the head and torso area."  Stine was trying to fight back.  Meanwhile, Gurfinkiel "was talking trash" with Boston.

At that point, Marlow and Parker were "yelling and screaming" and Gurfinkiel's mother came out of her home "and was yelling at [defendant] that they were fighting, *to stop them.*"  (Italics added.)  Defendant told Marlow, Parker and Gurfinkiel's mother to calm down.  After the women "had calmed down some," defendant approached "and tried to pull [Johnson] off the top of [Stine]." Defendant testified that he "was trying to break up the fight because they were drunk."  He "was trying to stop the altercation and incident so that nobody got in trouble."  Defendant grabbed "Johnson by his shoulders to pull him off" of Stine but he (defendant) slipped on the wet grass and fell.  Johnson and defendant were soon on their feet.  Stine remained on the ground "a little bit longer" "because he was drunk."  Defendant told Johnson to "just, get the fuck out of here."

Defendant and Johnson "kind of squared off" but then Gurfinkiel "came back up" behind Johnson and "either pushed him or punched him."  Stine stood up and attempted to join the fight. Defendant grabbed Stine, "wrapped him up like a

---

**5**     Defendant explained that Stine said something along the lines of "What you want, mother fucker.  What are you doing, mother [fucker]."

9

bear[,] . . . wrapped [his] arms around [Stine], holding him" and pulled him towards Gurfinkiel's home in an effort to stop Stine from fighting again. Stine "jerked away" and "went after" Boston who was walking away. Stine yelled to Boston: "Come back here, mother fucker; it's white power." Boston ran away so Stine rejoined the fight between Johnson and Gurfinkiel. Defendant "yell[ed] at them to get the fuck in the house." Boston started walking back towards the melee. Defendant testified that at that moment, he "grabbed [Stine] again and [Gurfinkiel's] mother grabbed [Gurfinkiel], and we pulled them back" and Johnson "walked off."

Defendant did not "recall ever kicking [Johnson] in his face" but conceded that when they fell down, he "may have" "kicked him in his shoulder." Defendant claimed that "there wasn't a time all three of us [defendant, Stine and Johnson] were fighting. *I'm trying to break up the fight*." (Italics added.)

Defendant denied having a knife, having threatened to cut Johnson's throat, having stabbed Johnson, having seen anyone stab Johnson, or having said "nigger" during the incident.

Defendant claimed that after the fight had ended, he saw Stine's bloody knife on the sidewalk. Defendant picked up the knife and took it with him to Gurfinkiel's home. Defendant asked Stine if he (Stine) had stabbed Johnson. Stine replied "that he just cut himself."

In regard to gang affiliation, defendant denied being a member of the SFV Peckerwoods but testified that he believed in "White Power" which he defined as "procreation," "[w]hite people with white people[,]" "sticking with my own."

2. *Impeachment of Defendant Through His 2008 Interview With the Police*

The police arrested defendant on November 12, 2008. That day, Detectives Fajardo and Doerbecker interviewed him. The interview was tape recorded.

10

During cross-examination of defendant, the prosecutor sought to enter the interview into evidence.[6] The defense did not object.[7] The tape recording was played for the jury and a transcript of the interview was entered into evidence.[8]

As will be explained in more detail when we discuss defendant's contention that trial counsel provided ineffective assistance because he failed to object to the introduction of the interview, defendant's statements to the police were, in large part, consistent with his trial testimony. He denied attacking or stabbing Johnson and claimed he entered the fight only to stop it.

However, some of his statements were inconsistent with his trial testimony. Defendant did not tell the detectives that Johnson had been the aggressor, either by crossing the street, talking "smack," or throwing a beer bottle and, at one point, defendant conceded to the detectives that Johnson fought only in self-defense. While defendant testified that he did not know who stabbed Johnson, defendant repeatedly told the detectives that Stine had stabbed Johnson and that he (defendant) knew where to find the knife Stine had used.

In addition, defendant, in the interview, set forth a more racially charged context for the fight and described a more aggressive Stine than he had in his trial testimony. Defendant told the detectives that the incident started when Stine called Johnson a "fucken nigger" and "ran up from the car[], . . . swinging at [Johnson] [whereupon the two men] started fighting."

---

[6]     Defendant testified that he had reviewed that interview to prepare his testimony.

[7]     As stated in our introductory paragraphs, defendant contends that he received ineffective assistance of counsel because his attorney failed to move to exclude the interview on the basis it was coerced. The facts relevant to that contention will be set forth later.

[8]     During deliberations, the jury asked to listen again to the tape.

11

Defendant also gave the detectives a different chronology of the latter part of the struggle and his role in it. As opposed to his trial testimony in which he claimed that only Stine was fighting with Johnson, defendant told the detectives that Johnson was "beating [Stine] up and then [Gurfinkiel] ran over and started fighting with [Johnson]." Defendant "ran over there" to pull Stine *and Gurfinkiel* off of Johnson because "they had gained the upper hand again."

## DISCUSSION

## A. FAILURE TO INSTRUCT ON SELF-DEFENSE, DEFENSE OF OTHERS AND MUTUAL COMBAT

Defendant contends that the trial court committed prejudicial error because it failed sua sponte to instruct on the theories of self-defense, defense of others and mutual combat. We disagree.

### 1. *Factual Background*

Before closing argument, the trial court instructed the jury. The court read, among other instructions, CALJIC No. 9.00 which defines assault. The last paragraph of that instruction reads: "A willful application of physical force upon the person of another is not unlawful when done in self-defense or in defense of others. The People have the burden to prove that the application of physical force was not in lawful self-defense or defense of others. If you have a reasonable doubt that the application of physical force was unlawful, you must find the defendant not guilty."

After the trial court finished reading the instructions to the jury, the prosecutor requested a sidebar conference. The following exchange occurred.

"[THE PROSECUTOR]: I believe that [the last paragraph in CALJIC No. 9.00] is inapplicable here. Defense has not sought any

12

self-defense instructions and, in fact, there is a series of instructions in the 5 section [of CALJIC] indicating that they shouldn't be available in this case. . . .  I would ask it be stricken from the written copy. . . .

"THE COURT:  [Defense counsel?]

"[DEFENSE COUNSEL]:  Well, we heard testimony from the defendant, defense of others.

"[THE PROSECUTOR]:  Well, the thing is, though, that that is a genuine defense that requires supplemental instructions that defense counsel did not ask for and, in fact, it's mutual combat.  It's contrived.  There was the failure to retreat from the fight.  There was a whole series of instructions that would have been relevant.

"[The last] paragraph [of CALJIC No. 9.00] is not merited under these facts. . . .  *I think that putting it in front of the jury is raising an issue that defense, so far, has not raised*, and it would be likely to lead to confusion if we have it in front of them.

"[DEFENSE COUNSEL]:  Again, he [defendant] testified one of the reasons that he got involved in this was to pull Mr. Johnson off of Mr. Stine . . . because he was getting beat up.

"[THE PROSECUTOR]:  But if defense intends to argue that and wants to rely upon that paragraph, there is a whole series of instructions which are actually not favorable to this defendant dealing with mutual combat, contrived self-defense, et cetera.  That paragraph [in CALJIC No. 9.00] is not the way to do it.

"If defense counsel wants to litigate whether he can be allowed to give other instructions, that's a separate issue, but that paragraph would need to be accompanied by those instructions and should not be in front of the jury right now.

"[DEFENSE COUNSEL]:  I think those other instructions are sua sponte. . . .

13

"THE COURT: . . . We spent three days going over jury instructions, and I asked both counsel numerous occasions if there were any other instructions that were required or requested.

"And I specifically asked [defense counsel] twice if there were any instructions that were being requested, and none were requested.[9]

"[DEFENSE COUNSEL]: I'm satisfied with the jury instruction that we have here.

"[THE PROSECUTOR]: I think legally that argument is unsupportable because that bracketed paragraph which one would . . . have expected to have been stricken requires genuine instructions that weren't requested.

"I will submit on that, Your Honor.

"THE COURT: At this point in time, I am going to strike the self-defense paragraph 9.00.

"And I guess we are going to just send the jury away and litigate the other issues regarding the other instructions if defense is seeking to add them at this point in time.

"[DEFENSE COUNSEL]: Well, I believe, even if that is struck, I can argue to the jury that that fact itself of him pulling someone away goes to his intent to commit a crime and is a specific intent, also.

"THE COURT: So you are not going to argue self-defense, then. Because if you are going to argue self-defense, we are going to have the self-defense instructions, with which there are a series of those.

---

**9** The trial court's recollection was correct. On three occasions, the court and the parties discussed jury instructions. Twice, the court asked defense counsel if he had any additional instructions he wanted the court to review. Each time, defense counsel replied "no."

"I know [the] People, obviously, can argue that it was contrived and not legitimate self-defense; so they may or may not be given. This is why I asked for jury instructions at the beginning of trial so we are all on the same page and we don't hold the jury up.

"[DEFENSE COUNSEL]:  I understand.

"Then – I am still able to argue his act, however it may be characterized on the issue of his specific intent.

"THE COURT:  Of course. . . .

"[THE PROSECUTOR]:  I think that's legally not supportable [for defense counsel to argue self-defense or defense of others].  The thing I think defense counsel can argue is that the physical action of the defendant was intended not to promote the fight, but to pull someone out of it.  But as to legally arguing it was defense of another, if defense counsel starts to make that argument, I would be entitled to a series of instructions which would invalidate that claim.

"[DEFENSE COUNSEL]:  I will submit.

"THE COURT:  . . . .  I will strike [the last] paragraph [of CALJIC No. 9.00] and . . .  will just go with argument of counsel.  *We won't include the extra instructions because testimony of the defendant seemed to be pretty clear that he was trying to break up the fight that was happening.*"  (Italics added.)


Proceedings resumed in the jury's presence. The trial court stated:  "With respect to the assault charge[,] the jurors are not to consider self-defense or defense of others, so that paragraph will be stricken."  The trial court then reread CALJIC No. 9.00 to the jury, omitting the paragraph set forth earlier.  The court also struck that paragraph from the written instruction submitted to the jury.

15

In closing argument, defense counsel urged, among other points, that defendant lacked any criminal intent because "when you look at the totality of the actions, according to [defendant], he tried to break up this fight."

2.  *Discussion*

Defendant contends that the trial court erred "by failing to instruct the jury sua sponte on self defense/defense of others and mutual combat."

The parties agree that "a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation] — evidence sufficient for a reasonable jury to find in favor of defendant [citation] — unless the defense is inconsistent with the defendant's theory of the case [citation].  In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .'"  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  But if the evidence of the purported defense(s) is minimal or insubstantial there is no duty to instruct on them.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145.)

In this case, however, defendant misframes the issue as being whether the trial court had a sua sponte duty to instruct upon self-defense, defense of others, or mutual combat.  As can be seen from the colloquy set forth above, the trial court and the parties discussed whether these very instructions were warranted.  The court ultimately ruled that it would not submit the instructions "because testimony of the defendant seemed to be pretty clear that he was trying to break up the fight that was happening."  Thus, the issue is not whether the trial court had a sua sponte duty to instruct but, instead, whether the trial court, once the issue of these additional instructions had been brought to its attention, correctly ruled that the

record did not contain substantial evidence to support their submission. We conclude that the trial court's ruling was correct.

Self-defense or defense of others requires the defendant: (1) to reasonably believe that bodily injury is about to be inflicted upon himself or a third person and (2) to use the force reasonably necessary to prevent that imminent harm. (CALJIC Nos. 5.30 & 5.32.) It is the prosecution's burden to prove beyond a reasonable doubt that the defendant did not act in exercise of one of those defenses. (See CALJIC No. 9.00.) If the jury entertains a reasonable doubt whether the defendant's use of force was lawful, it must find the defendant not guilty. (*Ibid*.)

Here, nothing in the People's case suggested that defendant acted in self-defense or defense of others. Johnson's testimony and the testimony of the two eyewitnesses (Marlow and Parker) described, in detail, an unprovoked and vicious attack fueled by racial hatred in which Johnson was the only individual who acted in self-defense.

In the defense case, defendant never testified that he acted to defend either Stine or himself. Instead, defendant, on multiple occasions, testified that the reason he entered the fight between Stine and Johnson was to end it. Defendant explained that he intervened after Gurfinkiel's mother asked him to stop the fight. Defendant testified that he "was trying to break up the fight because they were drunk"; that he "was trying to stop the altercation and incident so that nobody got in trouble"; and that he was "trying to break up the fight." None of defendant's testimony supports his appellate argument that he "reasonably perceived Mr. Stine to be in imminent danger" so that he acted first out of a desire to defend Stine and later a desire to defend himself. Stated another way, defendant failed to present substantial evidence that could persuade a reasonable jury to entertain a reasonable doubt that he (defendant) acted lawfully, e. g., to defend Stine or himself. (See,

17

e.g., *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243.) The trial court therefore did not err in declining to instruct on those defenses.[10]

Lastly, we reject defendant's argument that the trial court erred in failing to submit CALCRIM No. 3471, the pattern instruction about mutual combat. Mutual combat "consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046-1047.) CALCRIM No. 3471 sets forth the specific actions that a person who engages in mutual combat must take *before* he can claim self-defense: (1) he must actually and in good faith try to stop fighting; (2) he must communicate to his opponent, by words or conduct, his intent to stop the fight; and (3) he must give his opponent a chance to stop fighting. If a defendant's actions fulfill all of those requirements but the opponent continues to fight, then the defendant has a right to act in self-defense.

In this appeal, defendant argues: "The fight was mutual combat when it began because all testimony agreed that [the victim Johnson] crossed the street to [defendant's] and his friends' location when it was not necessary for him to do so. Thus, when the fight began and continued it was by implied consent or agreement." Based upon that characterization of the record, defendant contends that the trial erred in not submitting an instruction about mutual combat. We are not persuaded.

---

[10] The trial court's decision to delete the last paragraph to CALJIC No. 9.00 absent the submission of other instructions was correct. The Use Note to CALJIC No. 9.00 states, in pertinent part: "The last bracketed paragraph should only be used where there is a defense of self-defense and should be given with CALJIC No. 5.30 [defining self-defense] and other appropriate instructions." As alluded to by both the prosecutor and the court, the potentially appropriate instructions included CALJIC Nos. 5.52 ("Self-Defense--When Danger Ceases"), 5.53 ("Self-Defense Not an Excuse After Adversary Disabled"), 5.54 ("Self-Defense by an Aggressor"), 5.55 ("Plea of Self-Defense May Not Be Contrived"), and 5.56 ("Self-Defense—Participants in Mutual Combat").

18

The trial court is required to instruct on mutual combat only if there is substantial evidence from which the jury "could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose.*" (*People v. Ross, supra,* 155 Cal.App.4th at p. 1047.) The singular fact that Johnson and Boston crossed the street (a lawful act) does not constitute substantial evidence that Johnson agreed to engage in combat with defendant or his accomplices. In a similar vein, defendant's testimony that Johnson threw a bottle that did not hit anyone does not constitute substantial evidence from which a reasonable jury could find that Johnson agreed to fight. Further, there was no absolutely no evidence that, after the fight began, defendant (or Stine or Gurfinkiel for that matter) ever communicated to Johnson an intent to end the fight. Thus, the predicate requirements for the instruction were not supported by substantial evidence. In sum, the trial court properly found that the record did not warrant an instruction on mutual combat.

## B. FAILURE TO INSTRUCT SUA SPONTE ON ATTEMPTED VOLUNTARY MANSLAUGHTER

Attempted voluntary manslaughter is a lesser included offense of attempted murder. Defendant contends that the trial court had a sua sponte duty to instruct on that offense based upon the theory that if he (defendant) did not act in "self-defense, defense of another or in mutual combat, that *he acted in the heat of passion.*"[11] (Italics added.)

---

[11] During a reported discussion about jury instructions, the court asked defense counsel: "Are you seeking any lessers with respect to any of the charges?" He replied: "No." The court then asked: "And you considered this in making your tactical decision?" Defense counsel answered: "Yes." However, the trial court's duty to instruct on a lesser included offense exists even when, as a matter of trial tactics, defense counsel

19

The crux of defendant's contention is that there "was substantial evidence of provocation" in that he "acted upon a sudden quarrel or in the heat of passion when he attempted to assist . . . Stine." In particular, defendant argues: "Regardless of whether Stine approached Johnson, this approach did not occur until after Johnson had intentionally crossed the street in front of Stine and [defendant]. Moreover, if Johnson's approach was not sufficient provocation, the ensuing fight surely was." This contention is not persuasive.

The actions of a victim (here, Johnson) can constitute legally adequate provocation only if those actions are "'sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] "Heat of passion arises when 'at the time of the [attempted] killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'"'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-584.)

However, the trial court is not obligated to instruct about a lesser included offense (here, attempted voluntary manslaughter) unless "'there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.'" (*People v. Whalen* (2013) 56 Cal.4th 1, 68.) "'"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense."'" (*Ibid.*)

In this case, the trial record does not contain substantial evidence of legally adequate provocation.

---

elects not to request the instruction. (*People v. Barton* (1995) 12 Cal.4th 186, 195; *People v. Elize* (1999) 71 Cal.App.4th 605, 612-613.)

Contrary to what defendant suggests, Johnson and Boston's lawful decision to cross the street to the side where defendant and his companions were standing does not constitute legally adequate provocation. That defendant may have been offended by the action or found it provocative does not matter because an ordinarily reasonable man would not have felt that way. "'"[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions *of the ordinarily reasonable man*."'" (*People v. Manriquez, supra,* 37 Cal.4th at p. 584.)

In a similar vein, defendant's claim that the subsequent struggle between Johnson and Stine constitutes legally adequate provocation that caused him to join the fight must fail. As explained above, there is no substantial evidence that Johnson initiated the fight or that the fight was mutual combat. Instead, the record contains substantial evidence that Johnson simply defended himself against a racist attack that defendant had set in motion by taunting Stine with racist epithets. These were not circumstances that would have caused a reasonable person to respond rashly by joining the fight. "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the [defendant] responded . . . is not relevant to sudden quarrel or heat of passion." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

## C. REJECTION OF THE UNANIMITY INSTRUCTION

Defendant contends that the trial court's rejection of its request to submit CALJIC No. 17.01, the standard unanimity instruction, constitutes prejudicial error. We disagree.

1. *Factual Background*

On several occasions, defense counsel asked the trial court to submit CALJIC No. 17.01 to the jury. He argued that because either defendant's kick to Johnson's head or the stabbing of Johnson could form the basis of the assault or attempted murder charge, it was imperative that the jury be instructed that it had to agree which act constituted each crime.

The trial court rejected defense counsel's request for two reasons. First, it found that a unanimity instruction was not required because the People were proceeding under multiple theories, one being that defendant was guilty because he kicked the victim in the head and later stabbed him in the back and the other being that defendant was guilty on a theory of aiding and abetting. Second, the trial court relied upon the Use Note to CALJIC No. 17.01 that explains that the instruction does not have to be given "where the two crimes are so closely connected in time that they form part of one transaction." The trial court explained that "from the testimony I have heard[,] [it] is basically an ongoing fight and donnybrook that's taking place. It happened very quickly. [¶] And it's not an incident where there is a break-off in the acts." The trial court concluded: "In light of the events that transpired, the conduct engaged in by the defendant and his codefendants, as well as the aiding and abetting theory proposed by the People, I do not think the jury needs to have the unanimity instruction."

The trial court, however, did submit CALJIC No. 17.02 that explained that each count charged a distinct crime and that each count was to be decided separately. In addition, the court submitted the pattern instructions about aiding and abetting (CALJIC Nos. 3.00 ("Principals—Defined"), 3.01 ("Aiding and Abetting—Defined") and 3.02 ("Principals—Liability for Natural and Probable Consequences")). The last instruction explained the circumstances under which defendant could be found liable for attempted murder based upon the theory that

22

the attempted murder was a natural and probable consequence of defendant's aiding and abetting the commission of an assault with a deadly weapon.

In closing argument, the prosecutor argued: "[T]here were a number of things that the defendant did that could constitute felony assault, they can include kicking, beating and stabbing. . . .  It would be very, very reasonable for you to [find that defendant's] extremely hard kick to the left side of [Johnson's] face constitutes the type of felony assault that can result in GBI."  As for the attempted murder charge, she argued: "There are three possibilities for convicting the defendant of attempted murder.  You may find that the defendant, himself, with his own hands, tried to kill the victim [or] through his actions [that] he was actually trying to contribute to killing the victim himself.  [¶]  You may also find that he aided and abetted [Stine and Gurfinkiel] in the attempted murder of victim Johnson.  And then the third avenue for you to convict him is that he aided and abetted assault with a deadly weapon either with a deadly weapon or in a way which would produce great bodily injury and that the attempted murder was a natural and probable consequence of that assault."  "For you to convict the defendant of attempted murder, you do not need to know whether he did both stab wounds or either one of them."  "If the 12 of you . . . decide that the defendant is guilty of attempted murder, you do not have to agree as to the legal theory that gets you there."  "You just need to agree that that's the crime that was committed."

2. *Discussion*

"The key to deciding whether to give the unanimity instruction lies in considering its purpose.  The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [him] guilty of another.  But unanimity as to exactly how the crime was committed is not required.  Thus, the unanimity instruction is

23

appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135.)

This case presents the second situation because the prosecutor properly proceeded on multiple theories: defendant was the actual perpetrator of the assault and attempted murder *and* defendant was liable for those offenses on an aiding and abetting theory. In this situation, the jurors need not unanimously agree "'whether the defendant is an aider and abettor or a principal even when different evidence and facts support each conclusion.' [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1026.) In other words, "as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of [the charged crime] as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918-919.) It therefore follows that the trial court was not required to instruct the jury that in order to find defendant guilty of either assault or attempted murder, it must agree upon the act constituting each crime.

But even if we were to assume that the trial court erred in rejecting defense counsel's request for the unanimity instruction, the error would not have been prejudicial.

24

The courts of appeal are divided as to the proper standard for determining prejudice if the trial court erred in not submitting a unanimity instruction. (*People v. Matute* (2002) 103 Cal.App.4th 1437, 1448-1449.) The majority of courts have applied the standard from *Chapman v. California* (1967) 386 U.S. 18, 24. They found that the error is of constitutional dimension and thus requires reversal unless the error is harmless beyond a reasonable doubt. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 570.) Other cases apply the test from *People v. Watson* (1956) 46 Cal.2d 818, 836, finding reversible error only if "'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.'" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 562.) We apply *Chapman* and conclude that any error that may have occurred was harmless beyond a reasonable doubt.

"Under *Chapman*, 'where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless.' [Citation.] For example, where the defendant offered the same defense to all criminal acts and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error. [Citation.] . . . The error is also harmless '[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence. . . .' [Citation.]" (*People v. Hernandez, supra,* 217 Cal.App.4th at p. 577.)

Based upon those principles, we find that any error in not giving the unanimity instruction was harmless beyond a reasonable doubt. The defense was that defendant lacked any criminal intent. Although defendant conceded he had joined the fight, he testified that he had done so solely to end it. Defendant denied

25

kicking Johnson in the face, denied threatening Johnson with a knife, denied uttering any racial epithets, and denied doing anything except trying to stop the fight.

The jury's verdicts indicated that it rejected defendant's theory of the case. Or stated another way, it decided the credibility issue against him. "Given this record, it is reasonable to conclude that the jury believed beyond a reasonable doubt that [defendant] committed all acts if he committed any. Thus, the failure to give the unanimity instruction was harmless beyond a reasonable doubt. [Citations.]" (*People v. Curry* (2007) 158 Cal.App.4th 766, 784.)

## D. SECTION 654

Defendant next contends that the trial court's sentence violated section 654. We disagree, finding substantial evidence supports the trial court's sentencing decision.

1. *Factual Background*

During the sentencing hearing, defense counsel stated: "I know that we discussed this issue during trial when we had a discussion with regards to jury instructions, I would like to reiterate the position that I had then that the offenses of which [defendant] is convicted of in the present case did make up a single course of continuous conduct, therefore, altering the sentencing on these three counts for which he was convicted."

26

The prosecutor did not respond to this point. However, her sentencing memorandum, filed before the hearing, had urged a contrary conclusion and sought imposition of three consecutive sentences.[12]

Before imposing sentence, the trial court ruled: "The court finds that each crime was separate and distinct and that the defendant had time to reflect upon his actions before continuing his course of conduct."

The court sentenced defendant to three consecutive terms resulting in an aggregate term of 125 years plus three consecutive life sentences. The specifics of the court's sentence are: (1) a sentence of 42 years to life on the attempted murder conviction calculated as follows: the four-year high term plus a three-year term for the great bodily injury finding plus a ten-year term for the section 667, subdivision (a)(1) prior convictions plus 25 years to life under the Three Strikes law; (2) a sentence of 43 years to life on the felonious assault conviction calculated as follows: the four-year high term plus a three-year term for the great bodily injury finding plus a one-year term for the personal use of a weapon finding plus a ten-year term for the section 667, subdivision (a)(1) prior convictions plus 25 years to life under the Three Strikes law; and a sentence of 40 years to life on the criminal threats conviction calculated as follows: the four-year high term plus a one-year term for the personal use of a weapon finding plus a ten-year term for the section 667, subdivision (a)(1) prior convictions plus 25 years to life under the Three Strikes law.

---

[12] The memorandum reads, in relevant part: "Although the crimes were all committed against the same victim in a short span of time, each count of which he stands convicted is a separate and distinct crime. Each crime was distinct and complete before the commission of any other crime. Also, each crime had distinct intent and distinct elements. Although the events in this case occurred rapidly, the defendant had time to reflect upon his actions between the commission of the acts. [Citation.]"

2. *Discussion*

"'Under section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' [Citations.] This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken. [Citation.]' [Citation.]

"The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence. [Citation.] 'We review the court's determination of [the defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.]' [Citation.]" (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

Defendant argues: "[T]here is no substantial evidentiary basis for a finding that [he] possessed separate criminal objectives for an assault or criminal threats. Looking at the facts in the light most favorable to the verdicts, the purpose of the assault and criminal threats was only to facilitate the attempted murder."

Defendant's argument is not persuasive. We find, instead, that substantial evidence supports the trial court's implied finding that, over a short time span, defendant, having the opportunity to reflect, entertained multiple criminal objectives when he committed three separate offenses. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 ["If the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct."].)

First, defendant used racial epithets to provoke Stine into leaving the car and attacking Johnson. In self-defense, Johnson fought Stine. Defendant, armed with a knife, joined the struggle when he kicked Johnson "pretty hard" in the face. Defendant's actions evinced an intent to apply physical force on Johnson and inflict great bodily injury, thereby committing a felonious assault. (§ 245, subd. (a)(1).)

Johnson continued to defend himself from defendant and Stine. Defendant did not leave the fight but, instead, placed his arm around Johnson, pointed a knife at Johnson and told him that if he did not "get off" of Stine, he (defendant) was "going to cut [his] fucking throat." Fearing for his life, Johnson pushed defendant's hand away. These actions demonstrate that defendant intended, through his verbal threat and use of the knife, to place Johnson in reasonable fear that he would be killed. At that point, defendant committed the crime of making criminal threats. (§ 422; (*People v. Thornton* (1992) 3 Cal.App.4th 419, 422.)

But once again, defendant chose not to terminate his involvement in the attack even though he had succeeded in inflicting mental terror upon Johnson. Defendant and Stine continued to attack Johnson as Gurfinkiel joined the assault. Defendant, Stine and Gurfinkiel formed a circle around Johnson, and operating as a team, continued to hit him. Johnson tried to escape but defendant restrained him. During this portion of the struggle, Johnson was stabbed. By this point, defendant's actions, taken in concert with Stine and Gurfinkiel, evinced the specific intent to kill Johnson, resulting in the commission of an attempted murder. (§§ 664/187, subd. (a).)

In sum, substantial evidence supports the trial court's implied finding that defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) Therefore, the trial court's sentence does not violate section 654.

## E. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Defendant's contention of ineffective assistance of trial counsel begins with the claim that the trial court erred in admitting his interview with the detectives. According to defendant, the interview "was involuntary because it was the product of a custodial interrogation conducted without proper *Miranda* advisements" since the detectives failed to advise him that anything he said could and would be used against him. In addition, defendant claims the interview was coerced because the detectives ignored his repeated assertions of the right to counsel. The Attorney General correctly notes that trial counsel's failure to object to the admission of the evidence constitutes forfeiture of the claim. (*People v. Rundle* (2008) 43 Cal.4th 76, 122-123.) "Because the question of coercion turns on the intensely factual inquiry into the totality of the circumstances [citation], it is an especially poor candidate for first-time consideration on appeal." (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 78.)

Anticipating that forfeiture analysis, defendant advances the contention that we do address in this appeal: his trial attorney's failure to object "was objectively unreasonable" and therefore constituted prejudicial ineffective assistance of counsel. We are not persuaded. We conclude that defendant cannot establish that trial counsel's omission was either objectively unreasonable or prejudicial.

### 1. *Factual Background*

The interview, conducted in the police station after defendant had been arrested, lasted approximately 53 minutes. At the beginning of the interview, Detective Fajardo advised defendant, who was then 28 years old and handcuffed, of his right to remain silent, his right to an attorney "before and during questioning," and his right to have the court appoint an attorney for him.

Defendant indicated he understood those rights. The detective, however, did not advise defendant that anything he said could and would be used against him.

Detective Fajardo explained: "I'm going to tell you what we know . . . [a]nd then after that I'm going to ask you whether you want to talk to us or not." After Detective Fajardo recited how Stine left the car and attacked Johnson, he asked defendant: "Do you want to talk to us about it? It's a simple yes or no." Defendant responded: "You tell me what's been said and I'll tell you --" Detective Fajardo replied that defendant needed to answer his question "yes" or "no." Defendant replied: "Yeah, I'll talk about it. Why all of a sudden now though [nine months after the events]?" The detectives answered: "Cause we didn't know who you were" and "Your name didn't come up til recently." Defendant asked what was said. Detective Fajardo replied that "five different people" had told him that defendant had been there and "bragged about stabbing the African American guy." Defendant replied he was not "stupid" and would not "run around and brag" that he had stabbed someone.

After the interview had been conducted for approximately seven minutes, defendant stated, for the first time: "*I need a lawyer.*" (Italics added.) Detective Fajardo replied "Okay. There's --" but before he could finish his sentence, defendant asked to telephone his girl friend. The detectives responded that he could do so after he was booked.

Detective Fajardo explained that because he had not witnessed the crime, he was trying to determine what had happened. Defendant asked: "Is this shit going to end up getting put on me, honest? [¶] . . . I've been in and out of the system for 15 years." Defendant asked: "[Y]ou know more than -- from how you see it, is it on me?" Detective Fajardo replied "Yeah" and Detective Doerbecker said "Not completely." Defendant said: "I didn't stab that dude. All I did was try to stop it.

31

I swear to God." Defendant continued to maintain that he would never stab anyone.

Approximately 10 minutes into the interview, the issue of counsel again arose. Defendant asked: "*When am I going to be able to talk to a lawyer?*" (Italics added.) Detective Fajardo replied "Probably when you get arraigned tomorrow." Detective Doerbecker said: "Unless you want to call one once you're booked." In response to a question from defendant about a free telephone call, Detective Doerbecker replied: "I think you still get your free ones when you first get booked. You get a couple free ones then --" The interview continued.

Several minutes later, defendant asked: "What do I got to do to get out of this because there's a gang of people I can help you get, whatever. Rocky, Trish." Detective Fajardo asked: "What are they wanted for?" Defendant replied: "I don't know. What aren't they wanted? It's not like, necessarily wanted, but they're doing shit. Come on, you guys know who they are. I can't go to jail for the rest of my life for some shit some fucken kids did." Detective Fajardo stated that because "we were not there[,] . . . we [need to] hear your side of the story."

Defendant replied: "I'm on parole. I got arrested, everything, you know what I mean? I'm going to get the worse . . . end of this shit. [¶] . . . It's not going to matter what really happened or nothing." Defendant again denied involvement in the crimes. Detective Doerbecker said: "If you want to talk to us, have your attorney contact us, we'll be glad [to] sit down and talk to you. You can layout everything that happened." Defendant replied: "You know just as well as I do that I'm going to get fucked on this so it doesn't matter. [¶] . . . I already have three strikes. [¶] . . . I don't have no money, no nothing. What, some public defender is going to sit there fucken actually honestly defend me for fucken,

32

what?"[13]  Defendant offered:  "Is there any way I can just talk to my girlfriend real quick and then I'll talk to you.  I'll fucken tell you whatever the fuck you want to know about what happened then."  The detectives offered a speaker phone conversation.  Defendant said:  "That's fine."  The detectives telephoned defendant's girl friend and defendant spoke with her on the speaker phone her for several minutes.

After the conversation had ended, defendant said:  "What do you want to know?"  Detective Doerbecker explained:  *"We have to revisit the attorney thing. You want to talk to us without your attorney?"*  (Italics added.)  After defendant replied "I guess so[,]"  Detective Doerbecker stated:  "Don't guess.  *You either want to or you don't.  We don't want to force you.*  You can wait until you're arraigned, if you want."  (Italics added.)  Defendant responded:  *"That's fine.  I'll talk to you. . . .*  I didn't do nothing.  I got to prove it."  (Italics added.)  At this point, approximately 20 minutes had passed since the interview had begun.

For the next 30 minutes, defendant spoke freely about the attack, often responding to questions from the detectives.  In this portion of the interview, defendant repeated key parts of his defense multiple times:  (1) he had entered the struggle to stop it (nine times); (2) he had not stabbed Johnson (eight times); and (3) Stine had stabbed Johnson (six times).

Further, defendant made several statements essentially offering to help build a case against Stine as the stabber.  Defendant volunteered that he knew where Stine had disposed of the knife.  He offered to show the detectives a text message from Stine's girlfriend stating that Stine had admitted he had stabbed Johnson.

---

[13]  Towards the end of the interview, defendant said:  "I'm going to walk into court tomorrow and they're going to tell me, this is a three strikes case, 25 to life."

And at one point he said: "What the fuck do I got to do is sit on the stand and say that Gunnar [Stine] stabbed him, you know what I mean?"

Lastly, defendant indicated his understanding that what he said to the detectives could be used against him. When Detective Fajardo asked him whether he had kicked Johnson "a couple times," defendant responded: "And admitting that to you right now is going to give me life in prison."

## 2. *Ineffective Assistance of Trial Counsel*

To establish ineffective assistance of counsel, a defendant must show "'"that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant."'" (*In re Crew* (2011) 52 Cal.4th 126, 150.) "'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

### a. *Defendant Cannot Establish Trial Counsel Failed to Act as a Reasonable Advocate*

When, as here, the record fails to disclose why counsel failed to act in the manner challenged, we will affirm the judgment unless "there simply could be no satisfactory explanation" for counsel's omission. (*People v. Hart* (1999) 20

Cal.4th 546, 623-624.)  Here there are two satisfactory explanations for counsel's failure to challenge the admission of the interview into evidence.[14]

The first satisfactory explanation is that defense counsel decided that, on balance, allowing the jury to hear defendant's interview with the detectives would support, rather than hinder, the defense.  By the time the prosecutor moved to introduce the interview, defendant already had testified on direct examination that he had not attacked or stabbed Johnson but, instead, had entered the fight to stop it.  By not objecting to the introduction of the interview, defense counsel allowed the jury to learn that when defendant was first questioned by the police, he made many statements consistent with his trial testimony.  This tactic permitted the jury to hear and consider defendant's statements to the police for the truth of the matter asserted.  But if these statements had been offered by the defense, they would have been subject to a valid hearsay objection from the People.  What is more, defense counsel used those (hearsay) statements in his closing argument to argue that defendant was not guilty of the charged offenses.  This "is a classic tactical decision.  It defeats any contention that counsel was asleep at the switch or otherwise ineffective.  [Citation.]" (*People. v. Quiroz, supra,* 215 Cal.App.4th at p. 78.)

The second satisfactory explanation for trial counsel's omission is that he recognized that the trial court would have overruled an objection that defendant's statements in the interview were involuntary.  If an objection lacks merit, counsel is not ineffective in failing to make it.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1210.)  In that regard, the following principles are relevant to the claim that

---

**14**    Defendant also claims that trial counsel was ineffective because he failed to request the redaction of some of defendant's statements from the interview.  We address that claim when we explain why defendant has failed to establish prejudice as a result of counsel's omission(s).

defense counsel should have objected.  Statements obtained in violation of *Miranda* are inadmissible in the prosecution's case-in-chief but can be used to impeach the defendant when, as here, he chooses to testify at trial.  (*People v. May* (1988) 44 Cal.3d 309, 316.)  However, to be admissible for impeachment, the statements must be voluntary.  An involuntary statement cannot be used for any purpose.  (*People v. Neal* (2003) 31 Cal.4th 63, 78.)  Hence, the issue is whether defendant's statements to the detectives were voluntary or involuntary.

A statement is involuntary "when, among other circumstances, it 'was "'extracted by any sort of threats . . . , [or] obtained by an direct or implied promises, however slight. . . .'"'  [Citations.]  Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' [Citations.]"  (*People v. Neal, supra,* 31 Cal.4th at p. 79.)  This mandates, among other things, an "'evaluation of [defendant's] age, experience, education, background, and intelligence. . . .' [Citation.]"  (*Id.* at p. 84.)  That the statement was obtained despite the defendant's invocation of the counsel is one circumstance to consider but it is not dispositive.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041.)  The ultimate inquiry is "'"whether a defendant's will was overborne"'" by the circumstances.  (*People v. Dykes* (2009) 46 Cal.4th 731, 752.)

To begin, defendant's statements to the detectives indicate that he was well-versed in the ways of the criminal justice system.  He conceded that by age 28, he had "been in an[d] out of the system for 15 years."[15]  He recognized that the charges would constitute a Three Strikes case.  He acknowledged that an admission that he had kicked Johnson would be used against him.  He was familiar with and denigrated the value of the Public Defender's Office.

---

[15]    Defendant's probation report reflects that he has a lengthy criminal history going back to 1994.

Further, defendant's interactions with the detectives exhibited his savvy. At the beginning of the interview, he made several attempts to learn the specific evidence against him before he would answer any questions. Later, he attempted to trade information on others ("Rocky, Trish") "to get out of this" and offered to help build a case against Stine as the stabber. Taken together, these facts suggest that defendant's "operative ability to calculate his self-interest in choosing whether to disclose or withhold information" was functioning and that his "will [had not been] overborne by official coercion." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58.)

To reach a contrary conclusion, defendant primarily argues that his statements were involuntary because he invoked the right to counsel several times. We disagree.

Defendant's first statement "I need a lawyer" was not, as now claimed by defendant, a "clear[] request [for] an attorney." When viewed in context, the statement can be seen simply as an acknowledgement by defendant that he would need counsel to defend against any charges. Thus, it was not an unequivocal assertion of counsel that would require the detectives to terminate the interview. (See *People v. Suff* (2014) 58 Cal.4th 1013, 1068 and *People v. Williams* (2010) 49 Cal.4th 405, 429.) In any event, when Detective Fajardo began to respond to that statement, defendant interrupted him and asked to telephone his girl friend (not his attorney).

Approximately 10 minutes later, defendant asked: "When am I going to be able to talk to a lawyer?" Defendant urges that this statement equates with a "clear[] invo[cation] [of] his right to counsel." We disagree. This was not an unequivocal assertion that defendant did not wish to continue the interview without an attorney. The question could reasonably be seen as a mere inquiry as to when

37

counsel would be available, an inquiry to which the detectives posed several answers. The interview continued.

When Detective Doerbecker said: "If you want to talk to us, have your attorney contact us, we'll be glad [to] sit down and talk [and] [y]ou can layout everything that happened," defendant essentially declined the offer, responding that he saw no value in the assistance of a public defender. Defendant agreed to speak about the events if he could speak first with his girl friend. The detectives complied with that request.

After defendant spoke with his girl friend, Detective Doerbecker explicitly asked defendant if he wished to speak to them without his attorney and told him that he had to give an unequivocal answer. Defendant agreed to speak without counsel. Defendant now suggests that this consent was coerced for two reasons. First, he claims that the detective's "question of whether [he] wanted to talk with them was clearly disingenuous" because he had already "twice invoked [his] right to counsel." The claim fails because, as explained above, defendant had *not* clearly and unequivocally invoked the right to counsel in the earlier portion of the interview. Second, defendant claims that his consent was coerced because he "still had not been informed that anything he said can be used against him." The argument misses the mark because the failure to give the complete *Miranda* admonition does not, in and of itself, constitute coercion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 814.)

Significantly, the detectives never made any threats or promises to defendant either before or while he told them his version of the events. They never promised him leniency in exchange for his admissions. Instead, they advised him that five people had told them about his involvement in the attack, including the fact that he had kicked Johnson in the head, and asked him to tell them what had happened.

38

This investigative approach supports the conclusion that defendant's statements were a product of his free will.

For all of the foregoing reasons, a reasonable attorney could conclude that a claim that defendant's interview with the detectives was involuntary lacked merit and therefore decide not to object to the introduction of the interview into evidence. Because such a decision constitutes "'an informed tactical choice within the range of reasonable competence,'" defendant's claim of ineffective representation must be rejected. (*People v. Bolin* (1998) 18 Cal.4th 297, 317.)

b. *Defendant Cannot Establish Prejudice As a Result of Trial Counsel's Failure to Object*

Assuming arguendo that the failure to object to the introduction of the interview constituted ineffective assistance of counsel, defendant cannot establish prejudice. "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different. [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) "'''A reasonable probability is a probability sufficient to undermine confidence in the outcome.''' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Defendant urges prejudice has been established because the prosecutor's cross-examination of him as well as her closing argument noted some of the inconsistencies between his trial testimony and his statements to the police. Further, he claims that this prejudice was exacerbated because the jury asked to hear the tape recording of the interview during deliberations. (See fn. 8, *ante*.) Defendant gives far too much weight to these factors. For one thing, the bulk of the prosecutor's argument relied upon the testimony of Johnson, Marlow and Parker to argue that defendant's guilt had been established beyond a reasonable

39

doubt. And, as previously noted, defense counsel also made use of the interview. He relied upon defendant's self-serving exculpatory statements to argue that defendant was not guilty. Since the interview contained statements that both parties relied upon to argue their case, the fact that the jury asked to listen to it during deliberations does not establish prejudice. Lastly, the People presented abundant and compelling evidence of defendant's guilt. In sum, defendant has failed to demonstrate that there is a reasonable probability that absent the admission into evidence of the interview, the result would have been different—a result defendant defines as a failure to convict him on the attempted murder charge.

Lastly, defendant argues that he was prejudiced because trial counsel failed to move to redact from the interview defendant's statements regarding the right to counsel, his parole status, his belief that this prosecution would be a Three Strikes case, and his venereal diseases.[16] (See fn. 14, *ante*.) The argument fails. The prosecutor did not mention any of those statements in either her cross-examination of defendant or her closing argument. In fact, some of this information was already before the jury. On direct examination, defendant had volunteered that he had suffered four convictions (three felony and one misdemeanor). Because abundant evidence of defendant's guilt was presented, we can confidently conclude that defense counsel's failure to move to redact those statements from the interview did not adversely affect the outcome of his trial. (*People v. Waidla* (2000) 22 Cal.4th 690, 719.)

---

[16] Ten minutes into the interview, Detective Fajardo asked defendant if he was taking any medication. Defendant replied: "Yeah, I take medication for Herpes and Gonorrhea."

## F.  PRE-SENTENCE CUSTODY CREDIT

The Attorney General correctly points out an error in the award of pre-sentence custody credit.  The trial court awarded defendant 1,480 days of pre-sentence custody credit and 222 days of conduct credit but incorrectly computed the total as 1,708 days.  The correct amount is 1,702 days.  We direct preparation of an amended abstract of judgment to correct that error.

## G.  SENTENCING

1. *Factual Background*

In the bench trial, the court found defendant had suffered two robbery convictions, a 1997 juvenile adjudication and a 1999 conviction as an adult.

Immediately prior to sentencing defendant, the trial court explained:

> "The court had the opportunity to [preside] over the jury trial throughout the proceedings.  Other than the fact that the victim [Johnson] was not murdered . . . , I can honestly say I have not seen worse conduct.  [Johnson] suffered a punctured lung [and] a nicked colon, requiring surgery.  And the jury found to be true the allegation that this was a hate crime.

> "In looking at rule 4.421 circumstances in aggravation, the court finds the crime involved great violence, great bodily harm, and the threat of great bodily injury and great bodily harm.  It also showed a high degree of cruelty and callousness in the fact that this was done because the [victim] was of African American descent.

> "In addition, the defendant used a weapon [a knife] at the time of the crime.  Also, the defendant used others to participate in the crime, . . . two codefendants [who] were not part of the jury trial but also took part in the conduct.

> "As to the factors relating to the defendant, when he was 14 years of age, he was arrested for a violation of Penal Code section 243.  Thereafter, as indicated, he was convicted [in 1997] of the robbery, he went to camp.  In addition to that, he has continued to

41

engage in violent conduct. His prior convictions and petitions are numerous and increased in seriousness. He served prior prison terms. And his prior performance on probation and parole were both unsatisfactory."

The court proceeded to sentence defendant as follows:

"[H]aving stated [its] reasons under California Rules of Court 4.421(a) and (b), the court will select the high term consecutive as to all counts and allegations.

"The defendant, therefore, will be ordered imprisoned for the aggregate term of 125 years determinate followed by three consecutive life sentences.

"[He] was convicted [of] three counts all of which were serious or violent felonies within the meaning of Penal Code section 1192.7. The court finds that each crime was separate and distinct and that the defendant had time to reflect upon his actions before continuing his course of conduct.

"Therefore, he shall be sentenced to the full term consecutive on each count as follows: as to count 2, violation of Penal Code section 245(a)(1), the court selects the high term of four years.

"In addition, the jury found to be true that he violated Penal Code section 12022.7, the great bodily injury allegation, for an additional three years.

"And that he personally used a weapon within the meaning of Penal Code section 12022(b)(1), for an additional term of one year[.] [U]nder the Three Strikes legislation, . . . the additional term of 25 years to life is added [to the eight-year term] for a total term of 33 years to life.

"In addition, he has two [section] 667(a)(1) . . . five-year priors, for an additional 10 years for a total term of 43 years to life as to count 2.

"Consecutive to that term [is] count 1, the attempted murder. . . . The court selects the high term of four years . . . , an additional three years because of the great bodily injury, plus the 25 to life under the [Three Strikes] legislation as previously indicated for a term of 32 years to life.

"Again, the two [section] 667(a)(1) priors can be added for an additional 10 years, for a term of 42 years to life.

"Consecutive to counts 1 and 2, the defendant will be sentenced [on count 3] to the high term of four years, the personal use [of a deadly weapon], for an additional one year as to that charge. The 25 years to life under the [Three Strikes] legislation for a term of 30 years to life. Again, the two [section] 667(a)(1) priors are added for a term of 40 years to life."

2. *Discussion*

As we explain below, the trial court committed two sentencing errors. However, there is no need to remand the case for resentencing. The trial court's remarks clearly indicate that based upon defendant's prior criminal record and the nature of the current offenses, it intended to impose the maximum sentence allowed by law. In other words, there is "no reasonable probability that a different sentence would be imposed if the matter were remanded for resentencing." (*People v. Woods* (1986) 177 Cal.App.3d 327, 334.) Therefore, we correct the errors by directing the trial court to prepare an amended abstract of judgment.

The sentencing provision cited in the Supreme Court's transfer order—section 667, subdivision (e)(2)(A)—explains how the minimum term of the indeterminate life sentence for a Three Strikes defendant is to be calculated. The defendant is to be sentenced to "the greatest of three time periods. The first period (option one) is '[t]hree times the term otherwise provided as punishment' for the felony offense, not including enhancements. [Citations.] The second period

43

(option two) is 25 years. [Citations.] The third period (option three) is '[t]he term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170 . . . .' [Citations.]" (*People v. Williams* (2004) 34 Cal.4th 397, 403.)

Here, the trial court selected option two (25 years) for each of the three counts. The Attorney General urges, and defendant concedes, that decision was error as to count 1, the attempted murder conviction. In that regard, option one provides for the greatest minimum term. The sentencing range for attempted murder is five, seven or nine years. (§ 664, subd. (a).) The trial court's remarks indicate that it would have selected the upper term had it considered that option. Three times nine years is 27 years. Thus the base term is 27 years to life. Four years for the hate crime enhancement (§ 422.75, subd. (b)) and three years for the great bodily injury enhancement (§ 12022.7, subd. (a)) are added to the base term, bringing the term to 34 years to life.

The remaining issue is the enhancement of defendant's sentence for his robbery convictions pursuant to section 667, subdivision (a)(1). The trial court added two five-year terms for those robbery convictions, one of which was a juvenile adjudication. That portion of the sentence was error because a prior juvenile adjudication is not a conviction within the meaning of section 667, subdivision (a)(1).[17] (*People v. West* (1984) 154 Cal.App.3d 100, 109-110, cited with approval in *People v. Weidert* (1985) 39 Cal.3d 836, 847-848, fn. 10, *People v. Smith, supra,* 110 Cal.App.4th at p. 1080, fn. 10, and *People v. O'Neal* (2000) 78 Cal.App.4th 1065, 1068 [the Attorney General concedes the error].) Consequently, only one five-year enhancement for a section 667, subdivision

_____

[17] In contrast, the Legislature (and the electorate) decided to treat certain juvenile adjudications as prior felonies for purposes of the Three Strikes law. (*People v. Smith* (2003) 110 Cal.App.4th 1072, 1080, fn. 10; sections 667, subd. (d)(3) and 1170.12, subd. (b)(3).)

(a)(1) prior conviction can be added to the sentence. As a result, defendant's sentence on count 1 is 39 years to life.

The trial court's sentences on counts 2 and 3 are correct except for the five-year term added to each for the juvenile robbery adjudication. Consequently, the correct sentence on count 2 is 38 years to life and the correct sentence on count 3 is 35 years to life. In sum, defendant is sentenced to an aggregate sentence of 112 years to life.

## DISPOSITION

The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation a certified amended abstract of judgment reflecting the following sentence: (1) on count 1 (the principal term) defendant is sentenced to 39 years to life calculated as follows: utilizing option one under section 667, subdivision (e)(2)(A)(i), the base term is 27 years to life to which is added four years for the hate crime enhancement (§ 422.75, subd. (b)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)) and five years for the 1999 robbery conviction (§ 667, subd. (a)(1)); (2) on count 2, defendant is sentenced to a term of 38 years to life calculated as follows: utilizing option two one under section 667, subdivision (e)(2)(A)(ii), the base term is 25 years to life to which is added four years for the hate crime enhancement (§ 422.75, subd. (b)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), one year of the use of a deadly weapon enhancement (§ 12022, subd. (b)(1)) and five years for the 1999 robbery conviction (§ 667, subd. (a)(1)); (3) on count 3 defendant is sentenced to a term of 35 years to life calculated as follows: utilizing option two one under section 667, subdivision (e)(2)(A)(ii), the base term is 25 years to life to which is added four years for the hate crime enhancement (§ 422.75, subd. (b)), one year of the use of a deadly weapon enhancement (§ 12022, subd. (b)(1)) and

five years for the 1999 robbery conviction (§ 667, subd. (a)(1)); and (4) defendant is entitled to 1,702 days of pre-sentence custody credit. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.